**In re Kenneth S. POWELL, D.D.S., P.C., Debtor.**

**Suzanne S. BAUM, Plaintiff,**

v.

**Ronald L. ROBERTS, Defendant.**

**Bankruptcy No. 95–46271–293.**
**Adversary No. 98–4019–293.**

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

May 27, 1998.

---

Mayer S. Klein, Eileen M. Love, Clayton, MO, for Plaintiff.

Christopher P. Cox, Clayton, MO, for Defendant.

Christopher J. Rausch, St. Louis, MO, for Trustee.

## *MEMORANDUM OPINION*

DAVID P. MCDONALD, Bankruptcy Judge.

### *JURISDICTION*

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 9.01 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B), which the Court may hear and determine.

### *PROCEDURAL BACKGROUND*

1. Kenneth S. Powell, Debtor, filed a petition for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) on October 13, 1995.

2. On January 21, 1998, Plaintiff, Suzanne S. Baum, filed an Adversary Complaint seeking specific performance of an alleged oral agreement to sell her claims against Debtor to Defendant, Ronald Roberts.[1] Specifically, Baum alleged that from approximately May 27, 1997 through July 21, 1997, she and Rob-

erts negotiated a sale of the claims she held against Powell, then valued at $367,166.54. Baum maintained that Roberts agreed to purchase her claims for $100,000.00. The parties, however, did not memorialize their agreement. Baum alleged that Roberts refused to close their deal on December 5, 1997 and, instead, offered to pay $75,000.00 for her claims.

3. Roberts moved the Court to dismiss Baum's adversary proceeding, arguing that the Court lacks subject matter jurisdiction (Motion 6). In a memorandum opinion entered May 15, 1998, the Court determined that, because the matters raised in Baum's complaint were core matters, the Court possessed subject matter jurisdiction over this adversary proceeding. Therefore, the Court denied Roberts's motion to dismiss (Motion 6).

4. Roberts filed a trial brief in which he asserts five arguments against the enforcement of the oral agreement into which Baum alleged the parties entered. First, Roberts argues the facts demonstrate that the parties did not reach an agreement regarding the sale of Baum's claims. Second, Roberts maintains that, even if the parties negotiated an oral agreement of the sale of Baum's claims against Powell, the agreement's enforcement is barred by the Statute of Frauds. Roberts reasons that the Statute of Frauds requires the alleged agreement to be in writing because the agreement contemplated the transfer or sale of interests in real property. Further, Roberts maintains that an exception to the Statute of Frauds that permits the enforcement of an oral agreement for the transfer of an interest in real property when, one, a party has substantially complied with the agreement and, two, not enforcing the agreement would deny that party the benefit of the agreement, does not apply in this case because there is no clear and definite agreement for the Court to enforce. Third, Defendant argues that the Parol Evidence Rule bars evidence of the

---

1. In describing the properties subject to the alleged agreement of sale, the complaint lists fewer than all the interests Plaintiff, through her husband, received from, or holds against, Debtor. On May 15, 1998, Plaintiff filed a motion to amend the complaint by interlineation to reflect that Plaintiff seeks specific performance of a sale of all the interests Plaintiff received from, or holds against, Debtor. Defendant did not object to Plaintiff's motion to amend and the Court, at trial of this matter, granted Plaintiff's motion.

oral agreement Baum alleges because any agreement the parties may have had was reduced and incorporated into a contract they signed on December 5, 1997. Fourth, Roberts argues that the equitable remedy of specific performance Baum seeks is unavailable to her because she has "unclean hands" as a result of breaching a written agreement for the sale of her claims that the parties entered into on December 5, 1997. Finally, Roberts reasserts his argument that this Court lacks subject matter jurisdiction of Baum's law suit.

5. Baum also filed a trial brief. In her brief, Baum argues that on July 21, 1997, Roberts agreed to purchase her claims against Powell for $100,000.00. This agreement, Baum asserts, was not contingent upon the execution of any documents and was breached on December 5, 1997 when Roberts refused to pay $100,000.00 to her.

Baum also argues that because the Statute of Frauds in Missouri Revised Statutes § 432.010, which applies only to "land" and related interests, does not apply here where she maintains the claims she allegedly sold to Roberts were not interests in real property but claims against a bankrupt debtor. Baum acknowledges that the agreement she asks the Court to enforce would require her to transfer interests (debts and securities) that are, arguably, interests in land. She maintains, however, that such transfers would be "incidental" to the transfer of her claims against Debtor, the majority of which consists of a court judgment and, therefore, do not fall within the Statute of Frauds.

Alternatively, Baum argues that if the Statute of Frauds applies, the necessary written evidence of the parties' agreement can be pieced together from the various written correspondences between the parties' attorneys and other documents the parties have agreed to submit as exhibits.

Third, Baum maintains that if the Statute of Frauds applies, her agreement qualifies as a settlement agreement and, in Missouri, oral settlement agreements involving land are enforced as an exception to the Statute of Frauds. The premise to this argument is that Roberts and Powell work so closely and have commingled their financial dealings so much that Roberts's efforts to purchase Baum's claims can be considered to be a settlement of Baum's rights against Powell.

Fourth, Baum argues that if the Statute of Frauds applies to the alleged oral agreement between her and Roberts, this Court may employ its equitable powers to enforce that agreement. Baum asserts that Missouri courts will invoke equity and enforce an oral agreement despite the Statute of Frauds when enforcing the oral agreement avoids injustice. In this case, Baum argues that equity favors enforcement of her agreement with Roberts because: she is a widow; Powell's case has been pending for many years; her rights against Powell have been limited by the Bankruptcy Code, and Roberts "hoodwinked" her.

Baum offered the following three responses to Roberts's contention that the Parol Evidence Rule bars evidence of the oral agreement she seeks to enforce:

(1) Baum argues that because Roberts has neither argued that the written agreement she signed to sell her claims against Powell to Roberts for $75,000.00 (the "$75,000.00 agreement") is binding, nor tendered the purchase price to her, that agreement cannot be the basis of a Parol Evidence Rule objection;

(2) Baum maintains that the $75,000.00 agreement is unenforceable as one she signed under duress and, therefore, cannot be the basis of a Parol Evidence Rule objection; and

(3) Baum argues that the $75,000.00 agreement cannot be the basis of a Parol Evidence Rule objection because Roberts defrauded her into signing it.

6. The Court held a hearing on this matter on May 18, 1998.

7. At the conclusion of Plaintiff's case, Defendant moved the Court to grant it a judgment as a matter of law. The Court took Defendant's motion under advisement.

## FACTUAL BACKGROUND

Upon consideration of the testimony, evidence and argument of counsel, the Court makes the following findings of fact:

1. From 1991 through 1994, Plaintiff, Suzanne Baum, was the Mayor of Creve Coeur, Missouri. During the eight years preceding her mayoral term, Plaintiff held various positions in Creve Coeur's government and operated a small business. Baum has two children, both of whom are now between twenty and thirty years old.

2. Defendant is a friend of Dr. Kenneth S. Powell. Roberts is a successful businessperson whose ventures include: owning and operating a nightclub; owning two liquor stores; organizing charter bus trips;investing in real estate, and managing between twenty and thirty pieces of real property.

3. During 1990 and 1991, Edwin J. Baum, Plaintiff's husband, loaned $170,000.00 to Dr. Powell for use in his investment company, Kenneth S. Powell Investment Corporation ("KSPIC"). Dr. Powell and his wife, Diane Powell, executed two promissory notes, one for $155,000.00 and one for $15,000.00, to evidence Baum's loan. Between 1990 and 1993, Debtor, KSPIC, and at least one other entity with which Dr. Powell was affiliated, Aerial Investments Corporation, executed various promissory notes, stock pledges, guaranties, quit claim deeds in favor of Edwin J. Baum to provide Baum with security for the loans he had extended to the Powells.

4. In the Spring of 1993, Plaintiff's husband was diagnosed as having lung cancer. Soon thereafter and until Mr. Baum died in October of that year, the Baums unsuccessfully tried to collect from Debtor the money Mr. Baum had loaned to KSPIC.

5. Plaintiff sued to recover the money her husband had loaned the Powells. She won a judgment of $284,074.70 against Dr. Powell, Diane Powell, and KSPIC jointly and severally. By garnishing Mrs. Powell's wages and Dr. Powell's practice, Plaintiff collected a small portion of the judgment.

6. When Dr. Powell filed his bankruptcy petition, he owed Plaintiff more than $300,-000.00.

7. Approximately two years ago (shortly after Debtor filed his petition), Plaintiff relocated to Washington, District of Columbia. Initially, Plaintiff worked as a fundraiser for the American Institute for Cancer Research but in January of 1997, she resigned that position when she began pursuing a degree from Case Western Reserve University as a full-time, distant student.

8. Although living in Washington, Plaintiff regularly read documents filed in Debtor's case and the adversary complaints filed in conjunction with Debtor's case. While reviewing these documents, Baum recognized that Roberts's name appeared in various bankruptcy-related filings and, in May 1997, she contacted him to determine if he was interested in purchasing the claims she held against Debtor.

9. In May 1997, Roberts and Baum spoke on the phone. Baum told Roberts she had a large judgment against Debtor which, in part, was secured by seven pieces of real property located in Kinloch, Missouri (the "Kinloch properties") plus the rights to develop those properties, and stock in Aerial Investments Corporation ("Aerial") to sell.[2] The parties agreed to let their attorneys, David Weiss for Baum and Charles Sindell for Roberts, try to negotiate a deal.

10. On May 30, 1997, after Weiss and Sindell spoke on the telephone, Weiss drafted a letter indicating that Plaintiff would transfer her rights against Debtor and her interest in the Kinloch properties and Aerial stock to Roberts for $208,139.00. Weiss noted that the offer to sell would be withdrawn on June 4, 1997.

11. Sindell failed to respond to Weiss's letter of May 30, 1997 and on June 6, 1997, Weiss extended "the date for responses and further action " by one week.

12. Sindell, by letter dated June 18, 1997, informed Weiss that Roberts was "interested in pursuing this matter, but he w[ould] not

---

**2.** These properties were among the deeds of trust and quit claims that Powell and his investment corporation transferred to Edwin J. Baum. Baum assigned his rights to Plaintiff. The Court will refer only to the Kinloch properties and the Aerial stock as the collateral Plaintiff sought to

sell to Defendant because, one, it is simpler than describing all the collateral Debtor and his investment corporation transferred to Edwin Baum and, two, Defendant testified these were the only interests in which he was interested.

agree to pay in excess of $100,000.00 for the interest that you [Weiss] have listed in your letter." Sindell also wrote that "[m]y client's offer is contingent upon the authority of the Powells to convey, pledge and/or lien these properties and also your client's authority to transfer her interest in these assets free and clear of the two Powell bankruptcy matters."

13. Weiss in a letter dated June 24, 1997, informed Sindell that Baum would be in St. Louis during July and wanted to meet with Roberts and Sindell. The parties agreed to meet on July 21, 1997.

14. On July 21, 1997, the parties and their attorneys met at Sindell's office. The testimony offered at trial differed on what transpired at this meeting. Baum's version of the meeting, is as follows, Roberts and Sindell were late for the meeting which angered Baum. After exchanging pleasantries, the parties discussed the sale of the Kinloch properties, Aerial stock, and other interests Baum was offering to sell. After lengthy discussions, the parties agreed that Baum would walk away from Debtor and never deal with him again by exchanging her interests for $100,000.00 cash. At the meeting's conclusion, Baum and Roberts shook hands and joked that it was probably the first and last time they would do so. Before parting, Baum asked Roberts if he was sure they had a deal and he responded affirmatively. Baum left the meeting believing she and Roberts had an agreement regarding the sale of her interests.

Roberts's recollection of the July 21 meeting differs from Baum's memory of that meeting. Roberts testified that the parties and their attorneys discussed the sale of Baum's interests but that any sale would be contingent upon numerous things, including the receipt of a letter from the Trustee appointed to administer Debtor's cases [3] stating that the bankruptcy estate did not claim an interest in the Kinloch properties and would not oppose the parties' transaction. However, at one point during direct examination, Roberts, in response to a question from Plaintiff's attorney, agreed that he had offered to purchase Baum's interests at the

July 21 meeting for $100,000.00. Later during the direct examination, Roberts emphasized that although the parties talked about a sale of Baum's interests for $100,000.00, he did not agree to purchase them for that amount. During cross examination, Roberts clarified that when he stated, during direct examination, that he offered to purchase Baum's interests for $100,000.00 at the July 21 meeting, his offer was contingent upon conditions such as receiving a letter from the bankruptcy Trustee and determining that the Kinloch properties were titled to KSPIC.

Sindell also testified as to his recollection of what transpired at the July 21 meeting. According to Sindell, the parties discussed a variety of issues necessary to the proposed transaction including: the purchase price, the timing of the proposed transfer, and the documents necessary to effect such a transaction. Sindell voiced concerns he had with the deal, including but not limited to: whether Roberts could raise the funds necessary to close the deal, and the amount of time Roberts would need to raise the money to pay Baum. Sindell denied that the parties reached an agreement at the meeting. He testified that he left the meeting believing that the parties thought they might have a deal, but that Weiss was going to address some issues Sindell had raised in the meeting and Roberts had to be certain that he could raise the funds he would need to pay Baum. Summarizing what was accomplished at the meeting, Sindell said that Roberts agreed to put down $5,000.00 earnest money, and the parties agreed to address the concerns Sindell had raised and then to sign a written agreement. Sindell testified that he did not recall Baum and Roberts shaking hands with one another at the meeting's conclusion.[4]

15. On July 28, 1997, Weiss sent Sindell a draft agreement for Sindell's and Roberts' consideration. In the letter that covered the facsimile, Weiss noted that he had written to Christopher Rausch, the attorney for the Trustee appointed in the two Powell bankruptcy cases, and provided him with "copies of the referenced documents" (presumably

---

**3.** KSPIC has also filed a bankruptcy petition.

**4.** David P. Weiss did not testify.

the deeds of trust, quit claim deeds, guarantees, stock pledges and assignments referenced in the draft agreement) so that Rausch or the Trustee may provide the parties with the Trustee's position regarding the transfer of Baum's interests to Roberts.

16. On July 31, 1997, Sindell sent Weiss a letter via facsimile in which he expressed five "questions, comments and requests" he had after reviewing the draft agreement Weiss had faxed to him three days earlier. Among the concerns Sindell expressed was:

"5. Please acknowledge my understanding that none of the quit claim deeds or assignments [from KSPIC to Edwin J. Baum] have been recorded, and that as a result, the record of title shows the various parcels of real estate [i.e. the Kinloch properties] owned by Kenneth S. Powell Investment and mortgaged via Deeds of Trust to Mr. Baum."

Sindell further noted: "I would prefer having the Trustee's letter prior to entry into the Agreement."

17. Weiss replied to Sindell's July 31 letter by a letter dated August 5, 1997, wherein Weiss answered various questions and suggested additional language be added to a written agreement to clarify one point. Weiss's August 5 letter satisfied all the "questions, comments and requests" Sindell expressed in his July 31 letter except one. Specifically, Weiss's letter did not satisfy Sindell's desire for a letter from the bankruptcy Trustee, or the attorney for the bankruptcy Trustee, indicating approval of the proposed transaction. Also, although Weiss acknowledged that the quit claim deeds of the Kinloch properties from KSPIC to Edwin Baum were not recorded, he did not question Sindell's statement that the record of title would show that the properties were owned by KSPIC.

18. Sindell testified that after the July 21 meeting, other issues had "cropped up" in telephone conversations between him and Weiss. One such issue was whether some of the stock Baum would transfer to Roberts was exempt under the Securities Act. Also, a replacement certificate had to be issued for the Airport Industrial Redevelopment Corporation shares Baum would transfer to Roberts.

19. On September 24, 1997, Weiss sent Sindell a letter informing Sindell that the replacement certificate for the Airport Industrial Redevelopment Corporation shares had been issued. Weiss also stated that "the only thing I am aware of that we are waiting on is a letter from the Bankruptcy Trustee or the Trustee's attorney advising that the sale and assignment of the debt and security instruments will not run afoul of either bankruptcy law or the orders issued in this case."

20. On September 24, 1997, Rausch sent Weiss a facsimile letter dated September 23, 1997, in which he recited that he and the Trustee had discussed the parties' proposed sale of debt and security agreements. Rausch indicated that the Trustee was not opposed to the "theory of the proposed sale." However, Rausch also stated that, given the history of Dr. Powell's bankruptcy case and the movement of funds between Powell and Roberts, the Trustee was concerned that Roberts "might, in fact be using estate assets to purchase" Baum's claims. Therefore, Rausch continued, the Trustee would require "documentary assurance that the funds used to purchase [Baum's] claim are not Estate funds" before he would "consent to the sale and give his blessing thereto." Neither Roberts nor Sindell received a copy of Rausch's letter or knew of it existence until March 1998.

21. In the fall of 1997, Sindell told Weiss he did not know if the deal would ever close and Weiss suggested that setting a "closing" would prompt the parties to act. Through a letter dated November 21, 1997, Weiss informed Sindell that he had decided to set a closing for December 5, 1997.

22. Sindell testified that he and Roberts were concerned about how the Kinloch properties that KSPIC transferred to Edwin Baum were titled and wanted to be certain that they were titled to either KSPIC or to Debtor. If the Kinloch properties were not titled to Debtor or KSPIC, Roberts would have to foreclose on them to clear their titles.

23. In late November 1997, Sindell received letter reports summarizing the results

of title searches of the Kinloch properties. The report for one property (the parcel commonly known as 5661 Mable Ave.) showed that an individual named Ann Barenberg was the last grantee of record. The report for a second property (the parcel commonly known as 8142 Granberry Dr.) showed that an entity named Wright Construction Company was the last grantee of record. The second property's report also showed a quit claim deed from Blue Haven Redevelopment Corporation to Wright Construction Company and noted a pending quiet title action Dr. Powell brought against Ray Brennan. Two of the letter reports reflected judgments Magna Bank had obtained and abstracted against KSPIC. All the reports reflected the respective deeds of trust KSPIC granted to Edwin J. Baum.

24. On December 2, 1997, Weiss transmitted, via courier, a revised set of documents that he expected the parties would use at the December 5, 1997 closing.

25. Because she would not attend the December 5 meeting, Baum executed an agreement on December 3, 1997, stating that she would transfer her interests against Debtor to Roberts for $100,000.00. Baum sent the agreement to Weiss with the expectation that Roberts would sign it on December 5, 1997.

26. Plaintiff's sole source of support as of December 5, 1997, was the income of $3,500.00 to $4,000.00 a month generated by her investments.[5] As of December 5, 1997, Plaintiff was residing in an apartment in Washington, D.C., with a monthly rent of $2,500.00. From her income Plaintiff pays her tuition and, from time to time, extends financial assistance to her two grown children.

27. Roberts testified that, as of December 5, 1997, he knew Baum was a widow and that Dr. Powell had not paid Baum the money he owed her, but denied then knowing that she was extraordinarily anxious to sell her interests.

28. On December 5, 1997, Roberts, Sindell and Weiss met for the "closing." Baum attended the "closing" via telephone. At the meeting, Roberts announced that he would not pay $100,000.00 for Baum's interests. Roberts testified that he decided not to purchase Baum's interests on either December 4th or 5th because he had not received the bankruptcy Trustee's letter that he and Sindell had requested, and also because he and Sindell had discovered the clouds on the titles to the Kinloch properties. Baum became angry when she learned that Roberts would not pay $100,000.00 for her interests. Discussions ensued. At some times during the course of these discussions, Baum spoke over a speaker phone to Weiss, Roberts and Sindell, and at other times Roberts and Sindell left the meeting room and Baum spoke privately with Weiss.

Ultimately, Roberts offered to purchase Baum's interests for $75,000.00. Roberts testified he believed a discounted sale price compensated him for both the uncertainty resulting from the possibility that the bankruptcy Trustee would challenge the transfer and the costs he would incur foreclosing on the Kinloch properties to remove the clouds from their titles. Sindell continued to counsel Roberts not to buy Baum's interests without the Trustee's letter.

Baum agreed to sell her interests for $75,000.00. Via an exchange of facsimiles, the parties signed a handwritten agreement (ap-

---

5. The Plaintiff argued, in part, that she signed the $75,000 agreement under duress caused by the Defendant taking unfair advantage of her financial condition. She explained she was a widow with fixed assets and the Defendant lowered his offer to $75,000 because he knew of her alleged financial difficulty. With these statements the Plaintiff placed into evidence the issue of her financial circumstance. The Court permitted cross examination regarding her finances. Plaintiff asked not to testify publicly to her net worth. In a compromise reached at trial, the parties agreed that Baum would file her net worth under seal with the Court. Only the attor- neys present at the hearing, Christopher Cox and Mayer Klein, and the Court were privy to the amount divulged. The attorneys were instructed not to reveal the Plaintiff's net worth and were further instructed to omit the dollar amounts listed from further questioning of Plaintiff. The Defendant, by consent, was excluded from court only during this cross examination concerning Plaintiff's net worth. For purposes of this decision, the Court recognizes only that Plaintiff's net worth is substantial. The Court finds Plaintiff's assertion that she was coerced into signing the $75,000 agreement due to her financial condition is without merit.

parently drafted at the meeting) stating that Baum would execute and deliver to Roberts all the documents that had been prepared to close the contemplated sale of Baum's interest in exchange for $75,000.00 to be paid on December 8, 1997 and the conference call ended.

Baum testified that she agreed to sell at the lower price because she felt pressured to do so. Baum felt emotional pressure to sell because she wanted to put her husband's dealings with Dr. Powell behind her and "get on with her life." Baum also perceived financial pressure to sell. She sensed that the principal which generates the income that supports her was being eroded by the expenses she was incurring to collect the debt the Powells owed to her; as Plaintiff phrased it, she wanted to "stop the attorney clock."

After the conference call was terminated, Roberts and Sindell asked Weiss if Baum would enter into a confidentiality agreement regarding the sale. When Weiss called Baum to ask her whether she would sign a confidentiality agreement she told him she was uncertain whether she would perform her obligations under the new agreement.

29. On December 6, 1997, Baum decided that she had been taken advantage of when she agreed to sell her claims for $75,000.00 and decided she would not honor the agreement she had signed the previous day. She notified her attorney of her decision.

30. Neither party has asked the Court to determine whether the $75,000.00 agreement is enforceable.

### DISCUSSION

The parties have raised many issues in their briefs and trial arguments but the Court will address only those necessary to the resolution of the case. The Plaintiff's adversary complaint seeks specific performance of the $100,000.00 oral agreement and does not seek any remedy in regard to the alleged $75,000.00 written agreement. The Defendant repeatedly reminded the Court that neither the Plaintiff nor the Defendant seeks specific performance of the alleged $75,000.00 written agreement. Therefore, this Court does not make any findings or conclusions of law as to the enforceability of the alleged $75,000.00 written agreement.

The threshold issue presented by this case is whether Baum and Roberts reached an agreement at the July 21, 1997 meeting and, if so, what the terms of that agreement were.[6] After thoroughly reviewing the testimony presented at trial as well as the exhibits submitted into evidence, the Court has concluded that Baum and Roberts orally agreed to a sale of Baum's interests to Roberts on July 21, 1997 for $100,000.00.

The testimony and the letters the parties' counsel authored both before and after July 21, 1997, however, convince the Court that the agreed sale of Baum's interests was contingent upon numerous events: one, Robert's receipt of a letter from the Trustee appointed to administer Powell's bankruptcy cases stating that he would not contest the sale, and, two, confirmation that the Kinloch properties were titled to KSPIC and free of clouds upon the title. Neither of these conditions were met before the December 5, 1997 closing. The first contingency was not met because, although Baum and Weiss received a letter from the Trustee's attorney, that letter was not provided to Roberts or Sindell until March 1998. Even if the Trustee's letter was timely presented to the Defendant and his attorney, the letter did not satisfy the contingency since it qualified the Trustee's approval and consent upon a showing that the purchase money was not coming from estate funds. The second contingency was not met because the title reports show that some of the Kinloch properties were not titled to KSPIC and there were clouds on the titles of others.

The two contingencies were material to the parties' agreement. Roberts would incur substantial costs to remove the clouds on the Kinloch properties' titles if he proceeded with the oral contract. The possibility that

---

**6.** The Court considers the threshold issue to be whether the parties reached an agreement and, therefore, entered into an oral contract because if they did not, there is no reason to consider the other issues the parties have raised such as: the application of the Statute of Frauds to the alleged agreement, the application of the Parol Evidence Rule to testimony of the alleged oral agreement.

**420**

the bankruptcy Trustee would challenge the transaction also changed the nature of the parties' bargain by interjecting uncertainty and possible delay. Because the contingencies were not met, the Court cannot enforce the $100,000.00 oral contract through specific performance. The Plaintiff's request for specific performance of the $100,000.00 oral agreement is DENIED.[7]

**7.** At the conclusion of the Plaintiff's case, the Court took under advisement the Defendant's Motion For Judgment as a Matter of Law. In support of his motion, Defendant argued that he was entitled to judgment as a matter of law because Plaintiff had not set forth a prima facie case, in part, because her evidence of an oral agreement between the parties was barred by the Parol Evidence Rule and because even if her evidence established the existence of an oral contract, the Statute of Frauds barred that contract's enforcement based on the $75,000 written agreement. The Court's discussion and conclusion that the parties reached an oral agreement for the sale of Baum's interest to Roberts on July 21 sufficiently addresses Defendant's contention that Baum's evidence did not establish the existence of an oral contract. The fact that the Court ultimately concluded that the conditions precedent to the parties' contract were not fulfilled renders a consideration of the Statute of Frauds superfluous. The Court, however, will briefly address Defendant's argument that the Parol Evidence Rule bars consideration of Plaintiff's evidence of an oral contract.

The Parol Evidence Rule bars the admission of evidence of an oral agreement which would vary or contradict a subsequent written agreement. *See Union Electric Co. v. Fundways, Ltd.,* 886 S.W.2d 169, 170 (Mo.App.1994). In this case

Roberts bases his Parol Evidence Rule argument on the writing the parties executed on December 5, 1997 in which Roberts agreed to purchase Baum's interests for $75,000.00. Roberts argues that this writing embodies the parties' entire agreement and therefore bars evidence of the prior oral agreement. This argument is based on the assumption that the $75,000 written agreement is in fact a written contract. The argument is inconsistent with, and ignores, the fact that the Defendant on numerous occasions throughout the trial, reminded the Court that the adversary complaint seeks only specific performance of the oral $100,000 agreement and neither he nor Baum had asked the Court to enforce the written $75,000 agreement. The Court has followed the Defendant's request and has not determined whether the $75,000 written document is, or is not, a written contract. The Court will not speculate as to its own findings as if the issue of the $75,000 agreement was fully tried before the Court. Since the status of the $75,000 document is not determined, it cannot serve as a basis for the application of the Parol Evidence Rule in regard to the oral $100,000 contract, the enforceability of which is the only issue before this Court. The Court enters no findings or conclusions of law concerning the enforceability of the $75,000 written agreement. The Court will deny Roberts's Motion for Judgment as a Matter of Law.